We will hear argument first this morning in Case 2255, Mahanoy Area School District v. B. L. Ms. Black? Thank you, Mr. Chief Justice, and may it please the Court. Tinkers should apply off-campus for three reasons. First, such speech can cause on-campus disruption. Second, respondents' approach would create chaos. And third, a school nexus requirement and Tinkers' substantial disruption test guard First, off-campus speech, particularly on social media, can be disruptive. The Internet's ubiquity, instantaneous and mass dissemination, and potential permanence make the speaker's location irrelevant, yet the decision below arbitrarily treats location as dispositive. Second, respondents concede schools can address off-campus speech, but they propose an administrative nightmare where the sheer complexity heightens the risk of calamitous error. First, a seven-part test would define the school environment. Second, then one would check if the off-campus speech fits within five separate First Amendment doctrines that have never been defined in the school context. Tinker would misdefiningly toggle in and out of coverage as kids move about today. This Court should not substitute the 20-year status quo of applying Tinker off-campus. Third, schools cannot target political and religious speech. Tinker applies off-campus only when the student targets both the school audience and a school topic. And more broadly, this Court can clarify Tinker's reach both on and off-campus. It is irrelevant that critical or unpopular speech is the but-for cause of substantial disruption. The speech itself must be culpable. It must inherently compromise school functions, like organizing walkouts. Or the speech must objectively interfere with the rights of others, like severe bullying. But if listeners riot because they find speech offensive, schools should punish the rioters, not the speaker. In other words, the hecklers don't get the veto. Schools' special needs are limited to teaching kids how to think, not what to think. I welcome your questions. Counselor, you said that the schools cannot regulate political or religious speech. But also that the schools can regulate speech from off-campus that is directed at the school. So what do you do with political or religious speech that is directed at the school? So, for example, a sign a student is carrying around off-campus that says don't approve the school bond funding referendum. How do you balance the one situation against the other? Well, that speech would not come within the school's regulation even remotely because it would fail both Nexus and Tinker. It fails the Nexus case because it's not directed to a school audience. That's the public. And it has nothing to do with a particular school. It's just not a school topic. So under our approach, and I think this is the government's approach too, it's identical, you go to two steps, either of which is easier for a court to handle in terms of protecting free speech. One, make sure the audience is the school and the topic has to be about the school. And if it's easier, go ahead and jump to Tinker and say that no matter how much offense someone takes to that speech, that's not a substantial disruption just because listeners are offended. Well, let's say that the protest is don't approve the school referendum because this school is awful or because Ms. Johnson is teaching at the school. And it's put out by somebody on there as a Snapchat. So it certainly reaches the school audience. Political speech that's directed at the school. Yeah, so you can have, that would be a school audience and if Ms. Johnson is a school topic, so it's a nexus test. And the reason why that could never satisfy Tinker, and that is because if it's just the listener's reaction, speech that's critical, even ridicule of a school, schools cannot punish it because of their offense or their reaction to it. They could punish the manner. So in other words, if a female student wants to say, Mr. Jones keeps calling on boys, that's fine. She can text about it. She can social media about it. She can't pick at the teacher's house or stand up in class and say it because that inherently interferes with the school's ability to teach. But she's entitled to her views and to express them. Thank you, counsel. Justice Thomas? Thank you, Chief Justice. Ms. Blatt, how do you separate that? What if a student said some of those same things that the Chief Justice posited, but in a social studies class? How would you separate that from then from just participating in class or as opposed to doing the exact same thing or saying the exact same thing off campus? Yeah, so Tinker, again, assuming it fits the nexus test, Tinker is always going to be context specific. And whether teachers or school officials can forecast a reasonable disruption depends on when and where the student speaks, how many people hear it, and what the student said. And when and where in the classroom is going to be very different as opposed to a sleepover. But now, when it's on social media to 200 people or even 1,000 people, there's no question that the effect might be different. But in your case, if you want to say, Ms. Johnson, you're a terrible teacher, she should do that in office hours or on social media. Not in the middle of class. That's disruptive. Can't do that. That interferes with the instruction of the classroom. So you did say, you mentioned context, and you said that, well, the sleepover is different from school, or you suggested that. And then you did mention social media. But aren't we at a point where if it's on social media, where you post it on social media doesn't really matter? You could do it in class, algebra class, or you could do it in a sleepover and say the exact same thing about Ms. Johnson. So how would that make any difference where you post it? Well, that's precisely correct. When it comes to the Internet, things like time and geography are meaningless, and it makes no sense whatsoever to say that the same speech is somehow within the school's regulation if it's one foot on campus or one foot off campus or at the Starbucks or at the CVS or in your car or on the school bus. The Internet is ubiquitous, and it just doesn't have a geography. So why does it have to be about the school? Can't there be comments about other hot-button issues or about current controversies like protests or Black Lives Matter or Antifa or Proud Boys or something like that? People can take sides that are just as disruptive in the school setting as comments about Ms. Johnson. The difference is from Tinker itself. Schools are not in the business of teaching kids what to think, Justice Thomas. You're entitled to think whatever you want about Israel or race or Black Lives Matter. Now, it's a different thing if you take something that's political speech, like the Confederate flag alone, it communicates nothing. But if you take that speech and terrorize a black student with it, then the message is I don't want you here at the school because you're black. That's very different than just the Confederate flag standing alone. I don't know what that communicates. I need to know more about context. But it's inconceivable that talking about a wide variety of religious or political speech, unless you take it in a way that uses that as a weapon to terrorize a particular student or teacher, it is off-limits. It has been off-limits since 1969. And the other side is just wrong to suggest that schools somehow are the gulag on campus. That has never been the rule since Tinker. Justice Breyer? Good morning. I read Tinker. And Tinker seems to say, in the context of a student protest in school at least, school, you cannot punish this unless there is material and substantial disruption or you invade the rights of other students. You cannot. It doesn't say if it does those things you can punish it. It says you can't unless. And the issue here seems is that apply off-campus. Why not? After all, if I look at the case here in the record, is there in the record something that shows that what this young woman did, I mean, she used swear words, you know, unattractive swear words off-campus. Did that cause a material and substantial disruption? I don't see much evidence it did. And the swearing off-campus did. I mean, my goodness, every school in the country would be doing nothing but punishing. And it certainly didn't help others. I mean, disrupt others. It didn't hurt others as far as I'm aware, as far as I can see in the record. So why isn't that the case? I mean, sure, if you exceed Tinker, unless you meet Tinker, you can't punish it, at least in the context of protest. And here, pretty clearly, it didn't satisfy what Tinker says is necessary to satisfy. So I think it's fair to have the approach that the concurring judge did below, which is, I don't really need to talk about any of this because the school failed Tinker, but the Third Circuit said it was dispositive. It didn't matter what she said. She could have done this to a thousand people every night of the season. All right, you want to review the Third Circuit. That's what's mystifying me. The Third Circuit says Tinker doesn't apply. If Tinker doesn't apply, they can punish more, not less, because Tinker puts some limits on what you can punish. In school, you'd think a fortiori outside of school. So what is mystifying about the Third Circuit and the other side's brief is that we think Tinker faithfully applied, and this court has not had a Tinker decision since Tinker. So I think it would be helpful to explain that substantial disruption can't be a direct but-for causation. But more to your point, they say schools can do whatever they want under five separate doctrines. They say look at strict scrutiny. Bullying, I don't know what they say. Extracurricular, I don't know what they say either. Maybe there's a conduct exception and also threats, but let's adapt all of this for the kid environment. Tinker has been a familiar test for 51 years, and it is, in this case, I don't think it's that difficult. The question is here. She targeted her coaches, the sport, and another teammate's ability to play, and the coach reasonably forecasted someone who berates with a profane gesture and a word. All three of those things is not somebody you'd want at the bottom of the pyramid, and the record was not just the swearing, but it was disrespect for the coaches and the entire team and her teammates in connection with the swearing. Justice Alito? Ms. Blatt, I understand you to say that schools cannot discipline a student for things that the student says outside the school, not in connection with a school program about subjects such as politics, religion, morality, economics, et cetera, et cetera. The problem is when the student says something that implicates those subjects but links it in some way to a student or a teacher. What you say is, and the Solicitor General makes a similar argument, it matters whether the speech targets the school. I have no idea what it means to target the school. Let me give you an example to make this more concrete. Since tinker occurred back during the Vietnam War, it will relate to that. During the war, a student says, the war is immoral. American soldiers are baby killers. I hope there are a lot of casualties so that people will rise up, even if that would cause a disruption in the school. I understand you to say the school couldn't do anything about it. Is that right? That's correct. That would be a heckler's veto. No can do. All right. So now the student says exactly the same thing, and he adds, quote, our classmate Johnny Jones' brother is one of those blankety-blank baby killers. Can the school do something about that? So that would turn not on obviously where, if it's on the Internet, the location. It turns on, I think, what the Third Circuit originally said in fact, obviously it was a decision by you, that says there has to be a line drawn between somebody taking offense and an actual objective interference with their ability to educate. I'm not sure your example would, but that's what schools have to face every day when you insult someone. Okay, that was not nice. Your feelings are hurt. We need to have a conversation. Yeah, well, see, that's where the, that is where I think there is a problem. Because when you tell me that it's, or you and one of the other very able attorneys says it's context-specific, it depends on the facts of the particular case, there are a lot of things you have to consider. I'm really worried about how that is going to be implemented. I think if we're going to, if schools are going to have any authority under Tinker, outside of school there has to be a clear rule. That's what I'm looking for. Sure. The clear rule has been, I think, under the law or policies in all 50 states, and it's certainly in written statutory law in 26 states, that the standard for bullying is severe, persistent harassment that interferes, actually prevents that child from getting an education. So being offended is irrelevant. You have to basically, it has to be very severe and persistent. Well, I just don't understand what that means in concrete terms. I'll give you another example. My time is basically up. A student believes that someone who is biologically male is a male, and there is a student who is biologically male but identifies as a woman, has adopted a female name, but the student who has the objection refers to this person by the person's prior male name and uses male pronouns. Can the school do something about that? I think with something like a name, a school could say, listen, we're going to have, everybody is going to be called by the name we have on the school records as a matter of decorum. We're going to do that. And if they want, they can just accommodate the person by saying, why don't you just call him, her, Johnny, or whatever the name is, and just use that and say Johnny's book. I think you just accommodate. But to answer your question about being, you know, that's like, Tinker has been around for 51 years. The federal government has like 10 federal agencies that deal with this. Schools have to deal with this every day. They try not to make mistakes while keeping kids from killing themselves because they're bullies. All right. Thank you. My time is up. Justice Sotomayor? Ms. Blatt, the problem that I have with Tinker is that I'm not sure it's any clearer a rule than any of the others that you're criticizing. Let me start with just this case. Can you punish the student for cursing at home or at her parents? Absolutely not, nor could you do that. Can you punish her for cursing in her conversations as she walks to school? Absolutely not. Although under respondent's test, I guess you can. But absolutely not. All right. Now, if you can't punish them for doing that, you're punishing her here because she went on the internet and cursed, and used a curse word related to what? To her unhappiness with the school and cheering, right? Yes. She berated her coaches, the sport, and other teammates. Well, we could quibble with that, but my point is I'm told by my law clerks that among certain populations, a certain large percentage of the population, how much you curse is a badge of honor. That would surprise many parents. However, if it is true, where do we draw the line with respect to targeting the school? Kids basically talk to their classmates. Most of their conversation is about school. Most of their exchanges have to do with their perceptions of the authoritarian nature of their teachers and others. And why isn't this any different than just that the coach of this team took personal offense? She spent a few minutes talking to students, reporting this incident. How is that a substantial disruption, number one? And how is this, the nature of this speech, such that it intends to provoke disrespect when she put it to a page that was supposed to disappear, and it was only a classmate taking a snapshot who showed it to anybody? I'm not impressed with the snapshot defense because she could do the same thing to a thousand people and say, oops, it disappeared, and I'm going to do this every night to my coaches. They don't like it. It's disrespectful. My teammates are afraid of me. I don't really care. And the answer is because she's a cheerleader and it's an extracurricular program where she consented to an extra degree of regulation because she's a school ambassador. It's a self-contained program that teaches not just teamwork but respect for coaches. Counsel, I note that the school's ban on cursing is only during the school year, and you did not rely or your teacher did not rely on that prohibition of cursing in its punishment of her. Right. These are all fair points in what was argued in the district court. I will say the district court said it was pretty much fatal to tinker that she said And with all respect, that is a silly, arbitrary, unfounded, has no basis in any common sense. It would be all of a sudden it mattered if she had sent it from the school parking lot and all of a sudden the school could look at it and apply tinker, and we would be having the same conversation in a Supreme Court case. But the fact she sent it at the cocoa hut shouldn't matter into the analysis. Justice Kagan? Ms. Blatt, it seems to me that your argument that tinker is the entire analysis may depend on a version of tinker that the lower courts really have not adopted. Because you say that there can't be any regulation of political or regulation of religious speech, but I'll just give you two cases. One where there was a ban on shirts saying we are not criminals to protest an immigration bill. Another, a shirt saying homosexuality is a sin. And in both cases, the court said tinker allows the school to say that you shouldn't wear those kinds of things to school. Do you think that's clearly wrong? It's not, I thought, I'll defer to you, I thought that homosexuality is a sin was fine. The border shirt or the we are not criminals was a fight where it had been, there was basically a match that was supposed to go off and when dueling factions are wearing dueling shirts where gang fights or fights are about to break out and there was a big dissent and a concussion. So I guess that's what I'm asking about Ms. Blatt because I would have thought, I mean maybe I did get that holding wrong, but I would have thought where students say we're going to come in with the confederate flag or we're going to come in with, you know, black lives matter or homosexuality is a sin or gay pride in ways that the school thinks is going to cause disruption, that the school can ban those if the school is right about that, that, you know, where, where, um, where those symbols or speech will cause severe disruption that the school can say, no, you can't bring your confederate flag to school tomorrow. So, no, I think the, the actual opposite is true. If you look at the school handbook that we cite and the New York school handbook says the same thing. The leading case on this is Katie versus Fillmore. It is a brilliantly, brilliant case where the t-shirt was abortion, uh, is homicide. Teachers, kids having abortions were upset. They said it was false because abortion is actually legal and the school said get over it. She's, he's passively wearing the shirt. He's not terrorizing kids with it. He's going about his day. Leave him alone. And that case is cited as the gospel case for heckler's veto. Now, when you're saying this, but that what we should do in this case is just make, uh, courts, you know, tell courts, look, uh, tinker is it. It's it on campus. It's it off campus, but in applying tinker, you have to, um, allow religious and political speech, no matter how disruptive the school, um, it will be in the school. Unless as, as, as that facts opinion says, and it's all of the Confederate flags say when it is used in context to terrorize a student, a particular student. Right. But it can't just be, we're all bringing our Confederate flags to school and it's going to cause a riot. So if, if, if there are gang riots and there are, yes, those cases are all dealing with the Confederate flag is being brought with the backdrop of race riots. There is no question that that is like a fighting word in context and fighting words aren't protecting. Well, now I don't know what you're saying is black because first you said a school can't, um, uh, prohibit Confederates flags, even if they're going to be disruptive. And now you say they can. So the difference is when we talk about disruptive, it's a misnomer. You cannot ban t-shirts and symbols because people are offended or they threatened to riot. Now you can in context, if you have a very extreme situation where a really the facts are a new black kid arrived at school and they raised the Confederate flag. Okay. Thank you. Mr. Black. Justice Gorsuch. I'd like to pick up where justice Kate left off. Um, I, I, I'm confused. Uh, you started off this presentation by saying political and religious speech are absolutely protected. But I think in response to the, both the chief justice and justice Kagan, you've suggested that there may be limits there as well. Um, can you explain what your test is? Yeah. The only limit is where that I've seen in any of the case law is where there are race riots and gang fights and student walkouts. You have very disruptive volatile environment in the school. So none of this applies to do anything to do with the question presented. So, so, so, so it is a major disruption test with respect to political and religious speech as well. It is a major disruption test that takes out the word just because students are offended and feelings are hurt and you're very angry about the speech. No, it's a, I understand that offense isn't enough, but if there's a major disruption that that is enough, it's a major disruption with reasonable just because kids say, miss so-and-so we're going to, we're going to riot. If that kid walked in with Confederate flag, then you suspend the kids who threatened the riot. You don't suspend the kid with Confederate flag. Sure. But if the school thinks that it's a, that the kids are reasonably reacting, uh, to offensive political or religious speech, then it, then it can, um, uh, address that issue. I would say not offensive. I would use the word terrorizing, terrorizing, terrorizing, terrorizing. Does it make a difference that this case involved in extracurricular activity? Yes. With respect to the application of tinker, because of what I said about the goals and you can offend and destroy the program without affecting the school at large. So here, uh, the student was not in any way, there was no disciplinary action taken with respect to the school. She was suspended from the cheer team. And I think under the other side view, she couldn't have even been asked to write an apology or suspended for one game. And, and she could do this every night as long as she waited for the cocoa hut to do it. She could parade her coaches all day long. And I think that that's very different. If students want to use swear words, even on the internet, uh, that's fine. And they can do it with respect to teachers too. It's going to have to rise to the level of harassment. Thank you. Justice Kavanaugh. Thank you, chief justice. And good morning, Ms. Gillette. I want to focus on the facts of this case a bit and my reaction to it. Uh, as you say, and I think helpful for you, the context here is a team, uh, and a coach, not the school more generally. Uh, but as a judge, uh, and, uh, maybe as a coach and a parent too, it seems like, uh, maybe a bit of a overreaction by the coach. So my reaction, when I read this, uh, she's competitive, she cares, uh, she blew off steam like millions of other kids have when they're disappointed about being cut from the high school team or not being in the starting lineup or not making all league. Uh, and just by way of comparison about, and to show how much it means to people, you know, arguably the greatest basketball player of all times inducted into the hall of fame in 2009 and gives a speech. And what does he talk about? He talks about getting cut as a sophomore from the varsity team. And he wasn't joking. He was critical. Uh, 30 years later, it's still, it's still bothered him. Uh, and I think that's just emblematic of how much it means to kids to make a high school team. It is so important to their lives and coaches sweat the cuts and it guts coaches to have to cut a kid who's on the bubble and, and good coaches understand the importance and they understand the emotions. So maybe what bothers me when I read all this is that, um, it didn't seem like the punishment was tailored to the offense. Uh, given what I just said about how important it is and you know how much it means to the kids. I mean, a year suspension from the team just seems excessive to me. Uh, but how does that fit into the first amendment doctrine or does it fit in at all in a case like this? Well, I don't think it does because the, it's analytically distinct whether the coach could act at all versus due process considerations about the extent of the punishment. And I think the rules, uh, but I mean, and also this is the remand point. The district lost, um, on this issue and the third circuit did not go on this rationale because there was evidence of the team cohesion. But I think, you know, whether I understand that Michael Jordan was upset, but at some point, presumably he was respectful to his coaches and there's a line that coaches always have to, uh, coaches have to know their team and know what, what works. They have to act in the best interest of all teammates, team participants. And one of the things you learn... In the moment, in the moment, you know that kid's going to be upset. Uh, and, and you, you know, you, you, you recognize that. I'm not saying this is justified necessarily. I'm not, but, but a year seems like a lot. Well, I mean, again, then you're going to be in the business of... I agree. That's the problem. I agree. Um, so the, so the due, on the legal issue, the do no harm, I think legally speaking, you know, we should try to do no harm here. Your approach would be to just say the Tinker standard applies regardless of the price, precise location of the speech and just remand. Is that enough? That's absolutely enough. Thank you. And I think, yes. Justice Barrett. Good morning, Ms. Platt. Um, so let me, let's assume that I think about the case in the following way. You know, that high school students enjoy the same free speech rights as everyone else. Tinker acknowledged that in the context of this, once you cross the schoolhouse gate, those rights are somewhat reduced because of the school environment and the need to, you know, control and avoid substantial disruption, but they're not lost altogether. But that nothing in Tinker suggests itself that it applies outside of the school environment. And so what you're asking us to do is to extend the school's authority that Tinker acknowledges outside of the school environment. And I think you have good policy reasons for doing that. You know, I think harassment, um, bullying, and I think threats of violence against the school and cheating are all things that would be of concern. I don't see a lot of doctrinal support for saying that Tinker applies, you know, that the school's increased authority applies. Tell me what you think doctrinally your best authority is. Sure. There are a hundred years of case law that was unambiguous that schools could regulate anything off campus. Well, let's assume I, I don't think there's, I think I read the history a little bit differently. What about in our precedent? Do you see anything in our precedent that really requires this extension of Tinker? Well, all the school speech cases, there's only four of them, are tailored to the school interest at stake. And so the question is in terms of what we, you know, need to protect the school. And if we're talking about a narrow category of speech that actually, uh, and what here is it's threatening the extracurricular program. So that doesn't fall into your cheating or bullying. It is speech that destroys the morality of team cohesion. Well, but I think actually, Ms. Black, that's part of the problem because, you know, you point out that the other side's test or proposed test has its problems at the edges because of the internet and remote learning and all of that. But your three-part test certainly has its own issues. You know, it's not going to be easy to apply. And I think a lot of the questions that you've gotten today show a concern, including in this case, that schools abuse this authority and that they punish things that maybe don't cause substantial disruption or political speech or religious speech that they shouldn't or, you know, I think you've heard a lot of skepticism about whether the speech at issue in this case actually caused substantial disruption. So I guess my concern is if we have two tests being offered or on offer, neither one is going to be easy to apply in all cases. They'll both have hard cases. Which one ought we apply? Which one is the more protective of speech? And let me ask you this. And so far as the policy concerns go, nothing in the First Amendment prohibits soft discipline, right? Like in this case, the cheerleader coming to school and being told, rather than being kicked off the team and punished, being told, we're aware of this Snapchat. This is not good for team cohesion. This is not respectful of your coaches. If we see any of this kind of behavior on the field or at practice or undermining morale, there's going to be a consequence. But not imposing one yet. That would be okay, right? Yes. But there are cases where the student was asked to apologize and the student sued the coach in the school and said, I don't have to say I'm sorry. I have a First Amendment right not to say I'm sorry. Okay. My time is up. Thanks. A minute to wrap up, Ms. Flatt. And I think this goes to Justice Barrett's question. Your choice is between the familiar tinker standard that has applied to social media over the last 20 years. Respondents are going to regulate off-campus speech, but they send schools into completely uncharted waters by replacing tinker with a Frankenstein's monster of First Amendment doctrines all mashed together. Respondents worry about schools suppressing too much speech, but telling schools they can regulate undefined categories of harassment, bullying, and speech inciting violations of school rules invites more suppression. Vague, unfamiliar rules don't work when student welfare is on the line. All this court needs to hold is that tinker is not subject to a territorial switch. Under respondents' view, it would not have mattered had BL derided her team and coaches every night throughout the season on 12 different social media platforms. Students shouldn't be able to place their speech off-limits just by stepping off-campus. Thank you, counsel. Mr. Stewart? Thank you, Mr. Chief Justice, and may it please the court. Under the Third Circuit's approach, BL could send out snaps from her home every evening disparaging the coaches, her teammates, and the enterprise of cheerleading. Such messages from a member of the squad would have an evident tendency to disrupt the functioning of a school program that depends on and is intended to instill values of team building and mutual support. In situations like these, school officials should be able to intervene to protect the interests of other team members. The Third Circuit's rigid geographic approach is particularly unsound in the context of online speech since there is no meaningful causal link between the place from which an online communication is sent and the likelihood that it will disrupt school operations. I welcome the court's questions. Mr. Stewart, if you get to the point of considering whether speech is directed at a school, I wonder how you parse that, because, you know, teenagers, maybe most of their friends, are also their classmates. And does that mean that anything that they generally send out directed at their friends has to be considered that it's directed at the school? I mean, first, we would say no even for purposes of the first prong of our test, which is, is it school speech? But the second thing we would emphasize is that even if speech is determined to be school speech in the sense that it focuses on the school as such, that doesn't mean that the school can regulate it. That just simply means that the school should have the opportunity to make the showing that the speech is likely to cause substantial disruption of school operations.  You know, opposing the school referendum because Ms. Jones is a terrible teacher. Do you categorize that as political speech, which is off limits, or speech directed at the school, which can be regulated? I mean, it's a little bit of both. The part that says we oppose the school referendum is very similar to the speech that was at issue in Pickering, the similar case about the rights of public employees. And the court said in that case, because there was no close working relationship between the teacher and the school board, there was no likelihood that this would disrupt workplace operations. The part that says Ms. Jones is a terrible teacher, that might take it over the line into school speech. But a single statement like that wouldn't, in our view, have the capacity to disrupt school operations. If there was a continuing, ongoing online campaign of virtual harassment or intense disparaging of Mrs. Jones or Ms. Jones, that might be a different situation. But a single negative comment wouldn't qualify. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Stewart, should we analyze the rules of a team, as Justice Kavanaugh alluded to, as opposed to the general rules that apply to the school population? Is there a difference in how we should treat team members versus just students? Yes, I think there is. And if I could say something about a comment that Justice Kavanaugh made in the first part of the argument. I think there is, in some sense, an intuition that people have that the punishment didn't fit the crime in the sense that the suspension was very severe. But there's another sense in which the punishment did fit the crime. That is, BL was suspended from the cheerleading squad, not from school. If a school had suspended her from school, that would have sent the message that this was considered to be unacceptable speech from any student. And that would have been a very difficult showing to make. But the sanction that was actually imposed sent the message that this was unacceptable speech from a member of the team. And I think it's not limited to the school setting or the team setting that people who participate in projects or organizations that have as part of their raison d'etre cooperation, team spirit, mutual support, they may have to accept limitations on their speech that couldn't be imposed on the workplace generally. For example, if I... Well, let me ask, let me squeeze in one other question real quick. When we talk about material disruption as a basis for preventing or disciplining students who engage in certain speeches or conduct, can you also localize that to the team so that if a team member disrupts the team, that it's okay to discipline that team member, even though you wouldn't normally do it, discipline that person as a member of the student body? Yes, absolutely. And I think it would be impossible to run sports teams at public high schools or, for that matter, public universities if that were not the case. It happens all the time that cheerleaders or student athletes will do things that disrupt the operations of the team but don't have any larger effect on the school as a whole. And at least so long as the discipline is limited to exclusion from the team or suspension from the team, that's not a problem. Thank you. Justice Breyer? As far as I can see, I can't write a treatise on the First Amendment in this case. And so at the moment, I'm thinking there are only two ways of dealing with it. One, treat it as an example. We can't go beyond that, look at the record, and then decide. Or the other is everyone seems to want some rule, and the rule, I think, might be take tinker as if it said, which it doesn't, as if it said school, you do have some authority where there's a substantial injury to disruption in the class or somebody's going to be hurt in that school, et cetera. And I would add, but remember, it's outside the school.  And even when it's inside the school. You're not a schoolmaster. Judge, be careful. Okay? I can say something like that. Well, what should I do? I think the three or four things I would say are, first, no per se rule that off-campus speech is categorically exempt from school regulation. Second, with respect to online speech in particular, the location from which the post is sent is more or less irrelevant to the likelihood that it would cause disruption. Third, a school can permissibly conclude, as in the team context, that particular speech will disrupt the operations of a particular school program, even if it doesn't disrupt the operations of the school as a whole. And fourth, in determining what counts as substantial disruption, we should look to the purposes of the program. And here, the coach testified at JA32 that part of the purpose of cheerleading was to teach team-building skills that students would take with them to later life. Team cohesion was not simply a means to some other end. It was one of the objectives of the program. And as I say, reasonable people could differ about whether this isolated snap would likely have the effect of disrupting team chemistry. But the Third Circuit's analytical approach would apply equally in a situation where BL had sent repeated snaps, disparaging the coach, disparaging the team, where absolutely the predictable effect would be a breakdown in team morale. Justice Alito? Suppose a student says something outside of school that relates to an important subject like politics, religion, morality, etc., etc., makes no reference to the school or to a teacher or a student, but the remarks are so offensive that they will predictably cause controversy within the school and could distract the students from the educational process. Does the school have any authority to discipline the student? No, not on our view. And indeed, the purpose in our analytic test of having a school speech prong is simply to provide a safe harbor to make clear that in the situation you posit where the speech off campus has no inherent connection to the school, the justification for regulation that people will be upset when the school day starts, that that's simply an illegitimate justification. All right, so an important part of the test that you propose is whether the speech intentionally targets specific individuals or groups in the school community. The verb target means select as an object of attention or attack. So does school target an individual, a student, or a teacher whenever it refers to the teacher or student? No, I don't think that's the case. This is a contextual approach where you would look at the speech as a whole and ask, is this predominantly a comment about an individual, a student, or is it predominantly a comment about a social issue? But the other thing I would stress is even if in a particular instance you get past the screen and say, this is school speech, that doesn't get the school home. What troubles me is that what you just proposed is a very nebulous line, and I'm quite concerned about the effect of this on freedom of speech. I think we need clear lines. Can you clarify, can you give me anything firmer than what you just said? I guess the two things I would say are, first, even in cases where we are applying Tinker, you should not just look to the likelihood that disruption will result. You should employ concepts like proximate cause to determine if a disruption does result, can that properly be attributed to the speaker, or is it the fault of the listener? The other thing I would say is the Tinker framework in some respects will apply quite differently in the schools. Justice Sotomayor? Mr. Stewart, your test speaks about, I'm not sure, and I'm following Justice Thomas' questioning, seems to focus on sports teams. But one could say that about any extracurricular activity, that there is team spirit of some sort involved in science lab work, in after school science lab work, in forensic speech writing or arguing. There isn't an after school activity where the spirit of that activity couldn't be perceived as being impacted by what people find is unpopular. So let's get to Black Lives Matter T-shirt, or the Confederate flag. How about if students in any after school activity want to wear those T-shirts? When would you say that the school could ban that? I would say not at all, at least not on the team building concept. But why? That is, I think that's simply a case in which the free speech rights of the students would be paramount. That is, it is possible in theory to imagine a team in which almost all the members support a particular political candidate, and to some degree the presence of a teammate who supports the opposing political candidate is going to be a source of argumentation. But that doesn't strike at the core of what the team is about. What strikes at the core of the team is... that the school could intervene at a certain point? Yes. I mean, it certainly could be the case that if people were kind of operating in close quarters and this pattern of tension was established, that that might justify some form of speech regulation that wouldn't otherwise be justified. I think the Seventh Circuit in Zemeckis case cited in the reply brief for the petitioner has referred to this as kind of a species of biting words analysis. And the idea is, even in the adult context, though we don't usually look at the reaction of the speaker, there are some forms of speech that seem intentionally provocative. Justice Kagan? Mr. Stewart, is speech in this case school speech? It is close to the line because it mentions school and it mentions cheer, but it also mentions softball, which is, that was not a school. So which side of the line does it fall on? I think it probably falls on the school speech line, but it's not entirely determined. So that means really everything that mentions a school at all is school speech, right? Because this is pretty generic. Well, it's not just the content that we're looking at. The speech, the snap was sent to a wide audience. It included a number of students, a number of cheerleaders. It predictably reached the cheerleading team and the coaches. And again, the fact that there may be some indeterminacy about the first prong of the test doesn't get the school over the hump. The school may still be unable to establish on remand, if the case is remanded, that this speech would have a natural tendency to disrupt team chemistry. Can I give you a few hypotheticals and you just tell me school speech or not school speech? And let's just assume that all of these cause substantial disruption, okay? Okay. Student emails his classmates the answer to the geometry homework every day after school. School speech. Student emails his classmates that they should all skip school tomorrow for an impromptu senior skip day. School speech. Student emails that they should refuse to do any work for English class until the teacher changes the syllabus to include more authors of color. School speech. So that can be punishable. If it causes substantial disruption. Okay. Student tweets that there's pervasive homophobia at his school and that prospective gay students should stay away. That seems like school speech, especially the last part of it, when it encourages other people to avoid the school based on this characteristic. Last one. Student tweets that his school really stinks and students should stay away. I think it's still school speech. It's an assessment of the school as a whole. And as I was saying earlier, the principal point of our school speech prong is to provide a safe harbor for situations where a student engages in very inflammatory off-campus speech that has no inherent connection to the school. And we want to say that the school simply can't try to make the case that that speech should be regulated because of the spillover effects it would have when school reconvened. Thank you, Mr. Stewart. Justice Gorsuch? Mr. Stewart, is there anything that the petitioner argued that you disagree with this morning? And can you explain to the extent there is any daylight between your test and theirs? I don't see any daylight. The only thing I would emphasize that I don't think is inconsistent with the petitioner's presentation is that in the context of on-campus speech, the courts have applied a concept of quasi-fighting words where taking into account the relative immaturity of the school audience and the fact that students are a captive audience, the courts have allowed school authorities to crack down on a narrow range of speech that couldn't be punished outside the school but is particularly likely to the cause of disturbance in the school environment. But with that small caveat, I would agree with petitioner's argument that in general, disagreement, even strong disagreement by the rest of the students, even on-campus speech is not a basis for regulation. And then if you could just address more broadly the thrust of the argument from the other side, which is that there's some irony in the fact that as avenues for expression have increased for all of us through the internet, this actually leads to more regulation of it by schools and that the authority for schools as in loco parentis grows and reduces the room for parental control and supervision. I think that the two things I'd say are that the internet is an extra option. People still do have the option. Students in high school still have the option of doing what people did in my day, that is express their views to their friends and classmates at parties, social gatherings, off-campus. There's no requirement that everything a student thinks and wants to communicate has to be communicated to the broadest possible audience. But I think the flip side is off-campus speech has a much greater tendency now than it did then to affect the operations of the school simply because it can be made available to a vast audience, not with respect to the chat, the staff, it's different, but a lot of online speech will literally appear on students' phones when they're back in class in the next school day. So I don't think it would be untoward for the court to take account of that potential effect of off-campus speech in deciding what the constitutional rules should be. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Stewart. I strongly share Justice Breyer's instinct when he mentioned that we probably can't write a treatise here and shouldn't write a treatise here and can't foresee all the things that could arise and a lot of the hypotheticals that have been raised. So I just want to get your reaction. If we just simply said the First Amendment does not categorically prohibit public schools from disciplining students for speech that occurs off-campus, period, it may matter that the analysis here involves or the situation here involves a team, not just the school more broadly, period, remand. Is that enough? I think that would be enough. It would probably be helpful to say with respect to online speech in particular, the location from which the speech was posted is ordinarily going to have no significant effect on the likelihood that it will cause substantial disruption. But we entirely agree that the court shouldn't be writing a treatise, and we particularly agree that this is not the occasion for the court to try to decide how the close cases involving in-school speech ought to be dealt with. And then I think you mentioned this, but the proportionality of the sanction here that I mentioned to Ms. Blatt, I guess, how do you see that fitting in at all, if at all, to the constitutional analysis? And maybe the answer is not at all. I think the length of the suspension doesn't factor into the First Amendment analysis. It might conceivably be the basis for a due process claim. As I indicated earlier, I do think the fact that BL was suspended from the cheerleading team rather than from school is significant. This would be a much harder case for the school if BL had been suspended from school entirely because that punishment would rest on the idea that no member of the student body could acceptably have said this, and that would be a much harder case. What made the speech objectionable was that it was coming from inside the team. Justice Barrett? Mr. Stewart, I want to go back to Justice Kagan's hypothetical about sharing the answers to the geometry homework after class. You said that would be school speech. Do you think it's speech to pass on the answer key? Yes, I think it would be speech. What about threats to the school? You know, I'm going to come in, I'm going to bring a gun to school tomorrow and open fire. I think it would still be considered speech. Things like true threats may not be constitutionally protected, but that's not on the theory that they aren't speech. I think it is important in the school context that if you had a student who, in his off-campus post, was trying to cultivate a vaguely menacing persona and was careful not to say anything that rose to the level of a true threat, but that was still intended to put his audience in fear, that's the sort of thing that a school ought to be able to regulate. But that's also the kind of thing that the authorities could regulate if there was someone who was discovered online threatening the school or menacing the school and seeming like it could be a risk, right? Again, if the communication rose to the level of a true threat, something that could be punished under criminal or civil law, even if an adult did it, yes, that would be true. But the circumstance we have in mind is... Let me ask you when my time is going to run out. Could a school seek a waiver of First Amendment rights for participation in an extracurricular activity like cheer? No, I don't think that the school could seek a blanket waiver. For instance, if BL had been suspended from the cheerleading team because the coach disagreed with her political views, that would be impermissible. That would be a clear violation, even though the only sanction was removal from the extracurricular. And it would be no different if the school tried to extract a waiver in advance of the right to engage in speech that had no inherent connection to the school or the team. Thank you. A minute to wrap up. Mr. Stewart? Thank you, Mr. Chief Justice. We've been discussing the school speech cases as though they were a doctrinal island. But I think it is worth pointing out that school speech is only one context in which participants in government programs can be made to accept speech restrictions that couldn't be imposed on the general public. So if I, for example, posted a message online that tracked the text of BL's snap, but instead of school, softball, and cheer, I put DOJ, law, and the Supreme Court, that would be constitutionally protective speech. But DOJ, as my employer, could certainly take the position that that was inconsistent with my job as a DOJ attorney. And that would rest in part on the fact that my employment at DOJ is voluntary on my part, but it would also rest on the fact that communications like that would have a much greater destructive tendency coming from within the department than from the outside. And the same principle applies here. Thank you. Thank you, counsel. Mr. Cole? Thank you, Mr. Chief Justice, and may it please the Court. At its core, the First Amendment prohibits content discrimination. Its bedrock principle is that a speaker can't be punished because listeners object to his message. Tinker announced a narrow exception to those principles. It allows school officials to punish speech based on its content if listeners object or might object in a disruptive fashion, but it is limited to school-supervised or school-sanctioned settings. This Court's school speech cases are called that for a reason. The authority they recognize is justified by and limited to the special characteristics of the school environment. So schools can prohibit pro-drug messages at school, but not elsewhere. They can ban profanity at school, but not at home. So, too, they can punish disruptive speech at school, but not at a convenience store on the weekend. Expanding Tinker would transform a limited exception into a 24-7 rule that would upend the First Amendment's bedrock principle and would require students to effectively carry the schoolhouse on their backs in terms of speech rights everywhere they go. It would also directly interfere with parents' fundamental rights to raise their children. A father shouldn't have to worry that if he brings his daughter to a Black Lives Matter protest about mistreatment of a black student at school and she posts a photo on Facebook, she might be suspended based on potential disruption at the school. BL was punished for merely expressing frustration with a four-letter word to her friends outside of school on a weekend. Her message may seem trivial, but for young people, the ability to voice their emotions to friends without fear of school censorship may be the most important freedom of all. I welcome the Court's questions. Mr. Cole, that sharp line I think you're trying to draw between on-campus and off-campus, how does that fit with modern technology? I mean, if the text or a snap that you send from the park and it's read in the cafeteria, is that off-campus or on-campus? So our test is the test that this Court applied in Morse v. Frederick, which is if you are under the school's supervision or sanction, the school has the authority that the school's speech cases give it. And if you're outside of the school's supervision or sanction, then the same First Amendment rights apply to you as apply to everybody else. The Internet doesn't change that, Your Honor. If anything, the Internet underscores the importance of assuring that kids outside of school have the right to speak freely because that's where kids speak. They speak to their friends. They share their most intimate thoughts on the Internet with their friends. If any time they do that, and that means that somebody in school at some point might read it, the school can therefore regulate it if it's a swear word or if it's disruptive or if people object to it in school in a way that causes problems for the school, then kids won't have free speech, period. They will essentially be carrying the schoolhouse with them wherever they go. It would essentially reverse tinker. You say in your brief a fairly obviously strong defense of the First Amendment, but then you say that the First Amendment rights adjusted for youth and context, and at that point I suddenly think, well, we're just back in the multiplicity of factors and nobody can tell quite exactly where any clear lines are. What do you mean by adjusted for youth and context? This Court has said that unprotected categories of speech can be adjusted for youth and context. It said it in the context of threats. It said it in the context of obscenity. So, for example, what is threatening to a 5-year-old is different from what's threatening to an adult. What is harassing to a 12-year-old girl is going to be different from what's harassing to a 25-year-old. So those kinds of adjustments, I think the law already recognizes those sorts of adjustments. Our point is you don't need the blunt instrument of tinker to deal with the problems of off-campus behavior that might have an effect in school because the First Amendment doesn't stand in the way. It permits regulation of threats. It permits regulation of bullying, harassment, cheating, as long as those are carefully confined by the existing First Amendment doctrine. You said the blunt instrument of tinker. I'm not sure it's so blunt. I mean, we've had trouble so far, I think, in figuring out exactly how it applies in the present situation. But just so I understand, no matter how disruptive a particular speech activity off-campus or, I gather, you know, on Snapchat is to the school, it has no choice but to tolerate that because it can't take any action against the student. Your Honor, it can't take action based on tinker. It can take action if the First Amendment permits it to take action. So if it is harassing, it is severe and pervasive in a way that interferes with equal access to education, they can take action consistent with the First Amendment. If it is bullying that is severe or pervasive enough to interfere with access to education, they can take action consistent with the First Amendment. If it is aiding or abetting cheating, they can take action consistent with the First Amendment. The simple rule is when you're inside the school or when you're under the school's supervision, the school has broad authority based on disruption alone. But outside of the school's supervision, the First Amendment governs and the school has the same authority that the city would have with respect to regulating speech that is not under its supervision. But that doesn't mean it can't take action. It just means it has to do so consistently with the First Amendment rather than what I would say is a blunt instrument. Just call it disruption and that's the end of the matter. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Cole, you a number of times have said, you mentioned that the location of the conduct or the speech at school, under the school's supervision. Isn't that complicated by the Internet and by social media? You could send the exact same messages that could cause problems from your local 7-Eleven, or you could send it to classmates who happen to be in class. You could send it over the weekend, but it still has a permanence that would certainly allow it to be used in class. I don't know how you locate the conduct in school versus out of school when you have social media. Thank you, Justice Thomas. I think you do it the way this Court has done in all the school speech cases. It said, does the school exercise supervision over the speaker? If it does, it can regulate its subject to enhanced power. If it doesn't, it can't. So, bong hits for Jesus could be regulated because it was at a school-supervised event. But if it was put on Facebook, it couldn't be punished. So, does the speech occur, and I'm sorry to interrupt you, but does it occur when it's written or posted or when it's read or downloaded? It occurs when the speaker acts. And, of course, schools are perfectly permitted to ban cell phones, et cetera, in school, and, indeed, Mahanoy High School does precisely that. But the question is, is the speaker under the supervision of the school? And if the speaker is under the supervision of the school, you can stop him from swearing. If the speaker is under the supervision of the school, you can stop them from publishing an article about teen pregnancy. But if the speaker is at home on the weekend, you can't stop her from publishing an article about teen pregnancy, and you can't stop her from swearing. Her parents could, and it's her parents' job to regulate, not the school's job at that location. So, if the speaker sends an email that is opened, sends an email over the weekend, but it's opened on Monday morning in math class, as far as you're concerned, the speaker is not under the supervision of the school? Right. The speaker was not when the speaker spoke is the relevant question. Okay. So, let me go to another area just briefly. Is there any difference between the regulation of athletes or participants and after-school programs, as Justice Sotomayor pointed out? Is there any difference between that organization, the after-school organization or activity regulating a student's conduct versus the school regulating the overall student body population? Well, I think with respect to whether Tinker should apply, no. That is, Tinker should apply in school-supervised and sanctioned settings, which would include at practice or at a game, et cetera, on the bus to the game, and not when a person is sitting in a convenience store on the weekend out of season. But I do think there's a separate question, Justice Thomas, which is independent of Tinker, and the Court of Appeals addressed this as a separate question. After it decided Tinker doesn't apply, it didn't end the decision. It went on and had a whole separate section on whether the school can impose conditions on voluntary participation in the activity and whether she violated those conditions, and it looked at that question, which is a separate question, and it found that she didn't violate any of the conditions that were imposed upon her, and that was the end of the matter. And the petitioners did not seek appeal in this court of that part of the question. So I do think there's a serious question of what sorts of conditions can a team impose on voluntary participation in that activity, but that question is not posed here because it's not part of the question presented, and it's not part of the question presented because they lost on that below. The court found she didn't violate any of the rules that she agreed to follow, and they didn't appeal on that matter. So let me ask you one last question. You mentioned disruption. I think that's the term that we've been using, can be regulated. Why wouldn't you allow, under your formulation, a school to take preemptive steps to prevent disruption, or does a school have to wait, await disruption before it can respond? Absolutely, it can respond to predictions of disruption, reasonable predictions of disruption. That's what the court said in Tinker. You don't have to wait for the disruption, but there does have to be a reasonable prediction of disruption. What's a reasonable prediction? What the courts have done is they've looked at evidence of whether or not the speech itself might lead people to be offended in a disruptive fashion, and so if in the past people have been offended in a disruptive fashion, you can now silence the speaker. Thank you. Justice Breyer? Thank you. The difficulty I have, I've already mentioned. A few years ago, a superintendent of schools, I think in San Francisco, said, you know, schools have changed a lot, the public schools, since when I went there. He said, today we don't just teach classical subjects. We're there to help the child have adequate health, in many cases to see that he's adequately fed. In quite a few cases, we become a caretaker, and we don't want to send them home immediately because there's nobody home, and we have to plan after-school activities. There are dozens of areas that didn't used to be thought of as within the purview of the public school. Today, in many places, they are. Now, add to that the Internet, and the Internet not just listening to teachers, but also doing homework, and also writing papers, sometimes vaguely defined, and sometimes in sometimes. How do I get a standard out of that? I'm frightened to death of writing a standard. And Tinker, after all, doesn't really write a standard. It just says you can't regulate school unless it substantially disrupts or hurts somebody else. It doesn't say, if it does, that you can do anything you want. You still must use some kind of test like proportionality or something else. And I can mention that often outside of school, it's the parent's job, not the teacher's, if, by the way, there are parents in the house, et cetera. And I can mention the differences and say, take those into account. But I do not see how to go beyond that, and any suggestions you have will be welcome. Sure, Justice Breyer. I think it's important that there be clear lines. That's why the Third Circuit issued the decision it did, to make sure that there were clear lines. Within the context of school supervision, whether it's an after-school program, whether it's a class trip, whether it's in the classroom, Tinker applies. And Tinker does mean that the school can shut down a speaker if those words are going to lead to disruption, period. Whether it's political, whether it's religious, that's the state of the law in the cases below. I don't know where the other side gets this exception for political or religious speech. It just doesn't exist based on the case law. But outside of school, the priority is not to give the school discretion to regulate kids' speech. It's to protect people's freedom of speech outside of school. So our line is, I think, quite simple. In school, you can apply Tinker. Out of school, you can't. What does that mean? It means you can't punish out-of-school speech because listeners in school might be disrupted by the message.  But it says that when you're doing that for out-of-school conduct, you follow the same rules that everybody else follows, with some adjustment for the fact that it's kids that are involved. But what we have then is a tailored approach, which deals with the specific problems at issue, rather than a sledgehammer approach, which says we're not going to try to define bullying or harassment or cheating or threats. We're just going to say if the school can call it disruption, they can punish it, even if it occurs on the weekend. I think that's a very, very dangerous proposition in terms of young people's free speech, and the court should be very clear, as the Third Circuit was. Thank you very much. Justice Alito? Mr. Cole, there is a huge gap between the broad and very important free speech issues that have been briefed and discussed this morning and the particular incident involved in this case. If we're going to address the broad issues, then I, for one, think we need clear rules that protect freedom of speech. On the other hand, if the court, having decided to take this case, wants to decide it without addressing those broad issues, of course the court could dismiss the case, and I assume you wouldn't have an objection to that. But if the court doesn't do that, could the court do something along these lines? Well, let me just say, Tinker applies in the school. It says nothing one way or the other about what a school may or may not do to student speech outside the school. We look at the particular comments made here. They're made in colorful language, but substantively they boil down to something like, I have no respect for the school, I have no respect for the cheer squad, I hate the school, I hate the cheer squad, I also hate my private softball team. A school can't discipline a student for off-campus speech that does no more than say, I hate the school, I have no respect for the school. So, you know, we're satisfied, Justice Alito, with a ruling in our favor. Whether you dismiss as improvidently granted, whether you say under no conceivable circumstance, under no conceivable test, is this speech proper to punish. But that, of course, is not the question that the court took. And if you're going to address the question that the court took, which is, should Tinker and its broad-based, free-floating, substantial disruption standard, which has no safe harbor, as the government puts it, for political speech or religious speech, should that be applied to kids not only when they're under the school's supervision, and they're captive, and they're more vulnerable, but should it apply to kids on the weekend, in the middle of summer, when they're talking to their friends on Snapchat? In essence, should the speech rights of young people be constrained throughout their lives as much as it is constrained in school? Schools are areas of strict discipline. They should be, they have to be. But kids shouldn't have to carry that discipline out with them when they're hanging out with their friends on the weekend. And that's the approach that both the petitioner and the solicitor general would put forth. We're asking for a clear line, as the Third Circuit said, that furthers the really, I think, critically important interest outside of the school context that we protect free speech, give kids the breathing space they need to be able to talk candidly and honestly, to share their emotions, to share their feelings, even about school, without fear that some administrator is going to say, oh, well, that was disruptive, or that's going to leave somebody else in school to be upset. And so we're going to punish you. You mentioned bullying, and I'm concerned about comments that do touch on important issues but relate directly to a student. So is there anything that a school can do about that? You say, I guess, that the school has more authority in this area than other government officials. So what can other government officials do about that without violating the First Amendment? So there are bullying codes throughout the country. They're generally limited to the school environment, just as sexual harassment is generally limited to the employment and educational context. So it may be a context-specific concept, but I think what schools can do is they can punish those who bully in ways that violate a constitutional prohibition on bullying. And we think a prohibition on bullying that mirrors the prohibition on harassment by being limited to severe or pervasive interpersonal aggression that interferes with access to education could well satisfy the First Amendment. This court hasn't addressed that yet. But what the petitioner's approach would do and what the solicitor general's approach would do is say we don't even have to address the question of how you define bullying because we'll just call it disruption and the school can regulate it wherever it happens. And that makes no distinction between what's mean and what is bullying. And there are important distinctions to be made there, and I think the First Amendment requires them. Justice Sotomayor? Mr. Koh, the problem with your line drawing is we have traditional categories, fighting words, obscenity, truth threats. We even have definitions of what constitutes sexual harassment. The level at which speech has to arrive to meet those standards is very, very high. And I'm dubious that most of the conduct that teenagers engage in would fit any of our traditional categories. So let's talk about harassment, okay? Common episode, I think I read it in the newspaper. A young girl is subjected to each time she goes out of the house, whether she's in the playground, not the school playground, or walking to school, with a group of classmates walking by and saying, you're so ugly. Why are you even alive? That's not a truth threat. They're not threatening her with any bodily harm. It is not harassment if that's all, if they're just speaking. So, and they're not interfering with her movement to or from school. Why, that would be the kind of situation that I don't see a First Amendment category fitting. So under your theory of this case, would the school be powerless? Absolutely not. The school would be permitted to regulate that conduct if it satisfies a First Amendment permissible definition of bullying. And we think a First Amendment permissible definition of bullying is severe or pervasive interpersonal aggression. What's aggressive about that? Access to education, which is in fact- Counsel, please stop. What's aggressive about it? It's basically walking by someone and saying, you're ugly. Why are you around? There's a lot of conduct that comes to the edge. You're now asking schools to determine what is constitutional in terms of misbehavior by students that they can attempt to control or not control? Your Honor, within the school context, all they have to find is that it's disruptive. One student could be being mean or teasing a student next to them, and the school can come in because it's disruptive, period. End of story. But you're saying they can't do it if that's happening outside the school context. That's right. Because outside of the school, the school doesn't exercise supervisory authority. The parents do. Outside of the school, the child has the protection of its parents. Inside the school, it doesn't. Inside the school, the child is captive. Outside the school, it's not. That doesn't mean you can't deal with bullying. Counsel, you said to me that there could be conditions to being a member of a team, correct? Yes. Could one of those conditions be that you won't post foul language on social media? I think the question would be whether that's necessary or even reasonable in terms of the purposes of the team. Well, let's look at this school code. It doesn't go far enough away, but it says we want the highest – must earn the right to represent the school by conducting themselves in such a way that the image of the school district is would not be tarnished in any way. Our cheerleaders or team members using foul language on social media or at any school function would be a tarnishment. You won't do it or you'll be punished. Is that a contract that's enforceable? I think that's a question that's outside of the scope of the question presented because they did not petition from the determination that she didn't in fact violate those rules. She spoke out of season. She did not speak at an event. But yes, I think teams have quite a bit of leeway in terms of imposing conditions on players. As long as they're set out in advance and the players agree to abide by them and they're reasonably tied to the needs of teams. So why isn't – I know what the court found below, but one of the things that it says here, the negative information rule of the cheerleading rules provided, there will be no toleration of any negative information regarding cheerleading, cheerleaders, or capes or coaches placed on the internet. Why isn't what your client did a clear violation of that part of the code? The court of appeals found that there was no information whatsoever in what she presented. And again, the petitioners did not appeal that determination. Justice Kagan? Mr. Cole, you're making Tinker basically a geographic test. And it's possible to read it that way. But it's also possible to understand Tinker as a decision about what's necessary for a school's learning environment. And it might be that student speech that occurs outside of school is sometimes going to cause fundamental problems, disruption of the school's learning environment. And I guess then the question is why we shouldn't acknowledge that and allow a school to deal with it. Well, Justice Kagan, our test is not a geographic test. It's a supervision test. It's the test that this court has applied in all the school speech cases. And I think there's two reasons. The first is Tinker is an exception to the bedrock principle that you can't punish a speaker because the listeners objected, even if they object disruptively. If you take away the line between what happens under school supervision and what happens outside, you have turned the exception into the rule for 50 million public high school students. The second reason is that this court's school speech cases are contrary to that notion. The article about teen pregnancy that this court said in Hazelwood could be censored because it was in a school-supervised newspaper. If the student went home and published the same teen pregnancy article on her own private blog, it would have the same concerns, the same effect, the concerns that were about privacy of other students. And yet the school couldn't regulate it, swearing or bong hits for Jesus. The bong hits for Jesus sign in terms of promoting drug use would have the same effect if it was put out of the kid's bedroom window while the students walked by on their way to school or put on his Facebook page. Those are some easy cases, but you've also been asked about bullying cases, harassment cases, and you've tended to say, well, sure, don't worry. You can deal with that because there may be constitutional codes that are anti-bullying or anti-harassment. And there may indeed, but I think we have a general sense that schools have more latitude over this kind of speech than other government officials. So I'll just give you one example. Suppose that there are boys in a school who have a website and rank all the girls in the school on matters of appearance and such things, or maybe talk about their sexual activities. And we wouldn't put people in jail for that outside of a school context, but it seems as though a school should be able to deal with it. Why not? I think a school should be able to deal with it, and I think that's what the bullying laws actually reflect, that intuition. There's no prohibition on bullying generally between adults. I'm just stipulating that there are some categories of speech that we could not punish outside the school context and ask you if you can't imagine cases where even though we couldn't punish it outside the school context, and I think mine is a good example. You can't put people in jail for commenting on other people's appearance, but shouldn't a school be able to deal with it? So yes, a school should be able to deal with it, but the way to do that is with a test that addresses that particular problem. As Justice Alito's opinion in the Sachs case for the Third Circuit said, the mere fact that you call it harassment doesn't mean the First Amendment goes away. You still have to assess, is it narrowly tailored or does it punish too much speech? And that question could well be affected by the school environment, could well be affected by the fact that kids are involved, but you should ask that question and decide that question with respect to a particular problem like bullying or harassment rather than adopt a broad-brush, free-floating disruption standard that, yes, it might reach that, but it also reaches political speech, it reaches controversial speech. What do you think about the SG's test, which basically says there is a distinction between in school and out of school, and we can't punish anybody for wearing a Confederate T-shirt outside of school, but once the outside-of-school speech is really about the school and affects the operations of the school, then it is subject to tinker again. I think the SG's test is the vaguest test that's been put before you. It would require schools to distinguish between speech that is spoken to a student as opposed to speech that is targeted at a student, speech that is about a program as opposed to speech that is targeted at the program. It would allow schools to define in an unreviewable fashion what is essential to any school program. Thank you, Mr. Cole. Thank you. Justice Gorsuch? Yeah, I'd like to follow up with where you left off with Justice Kagan. I'm struggling to understand the delta or difference between your test and the petitioner's at the end of the day with respect to off-campus speech that results in a person on campus being denied an educational opportunity, which is what I understood your test for off-campus bullying to be. What is the difference between that and a substantial disruption on-campus test? I think there's really two basic differences, Justice Gorsuch. The first is that their test disruption covers anything that anybody says off-campus that might have an effect on campus. Let me just pause there. I'm sorry to interrupt, but let me just pause there and say, rather than substantial disruption, you would say it has to disrupt an individual's educational opportunity. Again, I'm not sure what that difference is. Right, so maybe I misstated. Our position is that bullying can be regulated, like harassment, consistent with the First Amendment, where it is defined as interpersonal aggression so severe or pervasive as to interfere with access to education. All of that is critical to that definition. It's not just had an effect on the school, whereas their test is just had an effect on a school. Therefore, their test would encompass someone who puts up a sign that says, Blue Lives Matter More, or somebody who criticizes the coach for physically abusing players, or somebody who organizes an off-campus protest of a school's COVID policies. All of those things could be disruptive, but they wouldn't be bullying. They wouldn't be harassment. They wouldn't be threats, and under our rule, they would be protected. Why wouldn't they be bullying under your definition? Severe interpersonal, I'm sorry, I missed the rest of it. It strikes me as you could easily take a lot of those examples and put them in that bucket. I don't think so, Justice Gorsuch. Putting up a sign that says, Blue Lives Matter More is not bullying under any reasonable definition, nor is whistleblowing about a coach's physical abuse or calling for a protest of a school's COVID policies. But all of those things could be disruptive in the school, and under their test, they could therefore punish the speaker for expressing those messages. The other difference between our test and their test is that our test would require careful definitions of bullying, harassment, and the like, rather than just waving your hands, calling it disruption, and going away. And the problem with that is then you're not distinguishing between ordinary mean comments or teasing and bullying and harassment. And this court in Davis, and Justice Alito in the Sachs decision, said you have to make those distinctions if you're going to be consistent with the First Amendment. But you would agree, if I understand it, though, that there could be some school-specific First Amendment regulations, right? I mean, as Justice Kagan pointed out. And then let me ask you just to turn to another topic and back to this case. Why doesn't it make a difference that the speech here was addressed in the context of an extracurricular activity, and that the standards there may be different from, higher than, what may be required of all students in the school environment? So, I think it can make a difference, Justice Gorsuch. It doesn't make a difference to the question presented, which is simply whether Tinker applies out of context or not. No, I understand that. I'm moving now from the general to the specific, if we're going to go down the road of writing a narrow opinion. Right. So, to the specific, I think there are serious questions about sort of what sorts of, because extracurriculars are voluntary, schools can require students to agree to certain kinds of conditions on participation in the program, as long as they're set out in advance and consistent with the First Amendment. And so, for example, I think a school could say, if you're going to play on our team, you can't personally demean other players. And if they set that out in advance, and the student agrees to it, and then the student doesn't, they can punish the student. If they don't set that out in advance, and the student says something demeaning, they can bring the student in and say, hey, that's not acceptable. The condition for playing on this team is that you don't demean others. And then there's an eventual. How relevant is this? Hinges on whether there was a policy in advance? Well, it does, if the justification for the regulation is voluntary participation and agreement by the person to a certain set of conditions that would otherwise not be permissible, that's, again, that is a separate issue. The Third Circuit addressed that issue after it decided Tinker didn't apply. It didn't say the case was over. It said, there's a second issue. It may be, even if Tinker doesn't apply, that if she violated rules that she agreed to, that's a permissible basis for her expulsion from the team. And then they looked at it, and they found she didn't actually violate any of those rules. And, again, petitioners did not appeal on that question. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Cole. Good morning. I obviously think it's unfortunate this spiraled, this case, the way it did, and completely understand the young woman's reaction to being upset with the decision, as I mentioned, to Ms. Blatt. I think that's entirely typical and widespread for decades and decades when kids are disappointed by something like that. And then the coach's reaction, you know, seems like an excessive sanction, but we're not there. We don't know all the circumstances and don't want to second-guess that too much. But I guess I'll start where Justice Gorsuch was discussing with you. It just seems entirely different to be talking about a team and not a school, and I'm just not sure, and I'm going to ask follow-up questions about this. I'm really trying to figure out the practical difference for courts in the wake of this case between if we adopt your test and Ms. Blatt's test. So team, and then move on to that if you can. So our test is the tinker disruption standard applies within the school's supervised settings, not outside. So with respect to teams, if you're on the field, if you're at practice, if you're at the game, if you're on the way to the game, if you're, you know, then you are subject to tinker. Disruption applies. If you're at a convenience store on the weekend, tinker does not apply. End of story. Keep going, keep going. End of story. And the fact that you're on a team doesn't change that question, because there's nothing about your involvement in a team that affects the tinker analysis. But there is, I think, a separate and independent question, which is what sorts of conditions can a school impose on a person if they join, say, the football team or the pottery club? And those conditions might be different, and they were, and I think reasonable conditions are going to be permissible. And here they set forth some conditions. She agreed to abide by those conditions, and she didn't violate any of those conditions. This happened out of season. She did not do anything, you know, while she was in her cheerleader uniform. She did not post any negative information on the Internet. She basically expressed her frustration, as I'm sure you did when you, you know, had disappointing games, and as I did when I had disappointing races. And that didn't violate any of the rules, and that's the end of the matter, because they have not sought any review of that. So, in a separate case, you might take up the question, what sorts of rules are reasonable to impose on involvement in a team? What I will say is that if you look... Sorry to interrupt. Suppose, in this case, the Snapchat had been a racial epithet about the coach. A racial epithet about the coach? I think if they have a rule that says you can't demean other players or the coach, you can't engage in insubordinate speech to the coach or about the coach, then they could punish her. If they don't have a rule, they could bring her in. They could say, that is totally unacceptable. But they can't punish her for racial epithets. I guess this goes to Justice Gorsuch's question as well. Unless they have a clear enough policy in advance, you can't punish a student who uses racial epithets in a Snapchat about the coach or other players? In your view? No, I think here's what you can do. I think you can bring that person in, and you can say, that is unacceptable. If you have not set that condition out in advance, you then set it out. And then if they ever do it again, they're off the team. So you can definitely deal with it in a way that maintains the authority of the coach and the unity of the team. But if the justification for additional requirements on team involvement is that you have chosen to join the team, and therefore you can be asked to sacrifice some of your First Amendment rights in advance, well, then you have to be told what your sacrifice is. I just want to pick up on Justice Breyer and Justice Alito, because maybe I don't want to be misunderstood on what I'm saying. I think you can answer the question presented here very clearly without writing a treatise. And that's the point I was trying to make. And the question presented is just whether Tinker applies off campus. We can answer that yes or no. If we answer a yes, obviously that will answer the question presented. If we answer a no, here's the point for you. You still have all these exceptions that allow, as I understand it, the First Amendment, that mean that the First Amendment does not categorically prohibit public schools from disappointing students for speech that occurs off campus. So I think that's the point that Justice Gorsuch is making. You just do it differently than Ms. Blatt. She says Tinker applies off campus. You say Tinker doesn't apply off campus. But, by the way, the First Amendment still allows the schools to regulate speech that occurs off campus in a number of circumstances. I'm just wondering whether that's worth the candle. Well, I think it's very much worth the candle. Well, if it really creates different results. You're just saying that as long as they write the policies in advance, it will be... No, no, not at all, not at all. I think, look, there are hundreds of Tinker cases. Virtually all of them involve suspensions for things that kids do vis-a-vis as students. There's about a handful of teen cases. So that's a different category. I don't think it's presented by this case for the reasons I've indicated. With respect to the basic question presented, which is should Tinker apply off campus, the delta between our position and theirs is that ours says ours protects politically controversial speech. Ours protects whistleblowing. Ours protects venting frustration on the weekend. And ours does not say that schools can't address off campus speech. It just says if it's off campus, you have to address it consistent with the First Amendment rules that govern that particular problem. Mr. Cole, I want to pick up where Justice Kavanaugh left off. I want to make sure I understand your approach. Let's talk about the harassment example that you were discussing with Justice Sotomayor. Tinker doesn't apply off campus. Let's say that we're in that world. And you say that the school could, much like a city official, if I'm understanding this correctly, prohibit harassment that rises to the level of interference with another student's educational opportunities. And I assume that would be judged if the school adopted. Would you envision that in a bullying statute, or would you envision that in a school-adopted policy? I'll start with that. I think the schools have generally adopted bullying policies. The states have required them to adopt bullying policies. And there are many, many such policies. And our view is those are constitutional. Okay, so let me ask you about the test. So the policy comes from the school. So the school adopts a policy, say, about bullying. And then it gets challenged when a student is disciplined for off campus bullying. Let's imagine Justice Sotomayor's example of the, you know, you're so ugly, you're so ugly. And it rises to the level where the child just can't go to school anymore. Or the example about the disabled student who was taunted with sexually graphic images on his way home from school. That's subject to a First Amendment challenge in what you're saying. Well, there's a compelling state interest, but it's narrowly tailored. Is that what you're envisioning? Content discrimination? Our view is just as the sexual harassment law with respect to hostile work environment is permissible in terms of prohibiting severe or pervasive harassment that interferes with equal access to the employment place, so too a bullying law that prohibits severe or pervasive interpersonal aggression sufficient to interfere with access to education would be constitutional. I think it could be constitutional under Giboney, as this court suggested in our review with respect to sexual harassment. Or it would be narrowly tailored to a compelling state interest. But if you define bullying as some of the codes do, as anything that would cause emotional harm, you know, without these kinds of guardrails, I think that's not consistent with the First Amendment. And so the court ought to address that in an appropriate case and determine what the appropriate definition of bullying is. What about cheating? How does cheating fare? Justice Kagan's example of the student who goes home and emails out answers to geometry homework. So Giboney allows for the prohibition of speech integral to prohibited conduct, and that covers aiding and abetting. So aiding or abetting cheating is just not protected at all under Giboney. But what about, let's see, if you're thinking about something that's a crime, right, aiding and abetting is different. But the school can define in-school offenses. So it can define cheating as an offense. But what if it defines, you know, demeaning classmates as an offense? Well, I think it has to – I think what Giboney is about is speech integral to prohibited conduct. Right, unless it's prohibited conduct, but what is it saying? Conduct versus speech. Wait, I'm sorry, go ahead. The difference is conduct versus speech. The rationale of Giboney is if you're regulating conduct, the fact that there's some speech integral to that conduct doesn't make it a First Amendment problem. So if – and schools – So the cheating is – your answer is that the cheating is conduct. I mean, the circulation of the answers is conduct. Cheating is conduct, however it's done. And if you aid or abet cheating through the circulation of answers, yes, it can be prohibited. Okay. What would be wrong with a test like this? One of your problems is that it's difficult to define the school environment and what constitutes the school environment. What would be wrong with saying that the school environment exists when the student is relating – not just supervisory. I mean, that's an error. What about when the student is relating to the school in the student's capacity as a student? So if the student is directly communicating with the school, sending e-mails to the school, sending e-mails to a teacher at the teacher's school e-mail account, would those be within the school environment on your definition? Yes, because you would be subjecting yourself to the school's jurisdiction. If you call the school, if you send an e-mail to the school account, you are now subjecting yourself to the jurisdiction. But if you send a text to six of your friends who happen to be classmates and you do it on the weekend, you're not subjecting yourself to the school's jurisdiction and you shouldn't be treated as if you're in school. Thank you. A minute to wrap up. Mr. Cole? Thank you. Everyone agrees off-campus bullying, harassment, and threats, properly defined, can be regulated. The difference between the other side's tests and ours is this. Ours would protect political speech, whistleblowing, and venting frustration outside school, even if a principal predicts it will lead to disruption. Theirs would not. Ours would preserve the rule against content discrimination in the Heckler-Zeto outside school. Theirs would not. Ours would provide breathing room for free speech outside school. Theirs would empower school officials to monitor everything students say to each other anywhere. And ours would require clear definitions of off-campus bullying and harassment consistent with First Amendment principles. Theirs would call it disruption and dispense with further definition. The fact that Petitioner claims it can punish BL for a momentary expression of frustration on a weekend out of school and out of season shows how sweeping its approach is. Its rule would teach students they can never speak candidly with their friends without worrying that a school official will deem their views potentially disruptive and suspend them or otherwise punish them. That is exactly the wrong lesson to teach. Thank you. Thank you, Counsel. Rebuttal, Ms. Blatt? Thank you, Mr. Chief Justice. There's some sort of twilight zone going on when the head of the ACLU says that schools allow Heckler-Zeto punishment for whistleblowing, any kind of reporting, any kind of criticism, all that matters if someone is offended. And you have the Biden administration in the school district saying that's not true. That's not what Tinker allows. Now, Mr. Cole said the case law allows us to act like Soviets and the North Koreans. But since the Sachs opinion, the Morse concurrence, Fillmore, and Zalanek have left clear lines for schools and that Heckler-Zeto are not allowed. And your choice is this. You can choose to either tighten Tinker or you can say, well, we're going to assume Tinker is out of control on campus, but we will leave open season on schools and complete chaos as to what their test allows. Under their view, all 50 states define bullying in terms of Tinker. You have the same email chain that would toggle on and off campus and you would have the Tinker test applying when there's some on-campus speech. And I don't know what applies. I think Mr. Cole said it's the Tinker test, but he's afraid to use the Tinker word because it's scary. And it shouldn't be. You're much better off cleaning this doctrine up. Justice Kagan, you had amazing questions about school speech. Remember, our test is the audience has to be the school. So all of your speech, if it's to the press, the police, your pastor, your family, et cetera, none of that is school speech, even if it involves the school topic. Justice Barrett, on threats, the facts in Bethlehem and Pennsylvania and Bell, nobody knew whether that was a threat. The police were sort of involved. It is not fair to the parents of those other kids to have schools fumbling around. I don't know what this applies. Before we had Tinker, part of the threats were on campus, part were off. It was on the Internet. Let's look at where she drafted it. Maybe she was to and from. Now let's move to the school supervision. Madness, confusion, and chaos. Please don't do this to schools. Mr. Cole said you could prevent swearing to and from school. That's nuts. You're in the dad's minivan? That's school supervision under their view. No one thinks Frazier applies there. All of a sudden when you get out of the minivan and I guess walking to it, but maybe it depends on how far you park, Tinker is going in and out of coverage, that rule makes no sense. There's no case law on conduct that aids and abets school speech. You will have a school speech petition. You can keep denying cert, but I guarantee you the courts are going to freak out when Tinker has been the law off campus for 20 years. Thank you. Thank you, counsel. The case is submitted.